No. 5497.

EDWARD CONERY vs. ROTCHFORD, BROWN & Co.

No valid judgment can be rendered against any of the individual members of a former commercial partnership, who have not been cited, on the confession of an agent of the former firm, made after the dissolution of the firm. Such a judgment is null and void.

A judgment absolutely null, may be attacked collaterally, in any form of proceeding, by any one having the least interest to have the nullity pronounced.

In a suit to revive a judgment the defendant may allege and prove any fact showing the absolute nullity of the judgment. A judgment absolutely null and void, can not be revived. It is essential to the revival of a judgment that there should be a valid and subsisting one, which is a fact for the plaintiff to establish.

APPEAL from the Fourth District Court, parish of Orleans. *Lynch, J.*

*John M. Bonner* for plaintiff and appellant.

*Merrick, Race & Foster* for defendants.

The opinion of the court on the original hearing was delivered by EGAN, J., and on the rehearing by DEBLANC, J.

EGAN, J. This is a proceeding under article 2813 of the R. S. of 1870, and article 3547 of the Rev. C. C., to revive a judgment of the Second District Court of Orleans, alleged to have been rendered in December, 1863. The statute provides " that any party interested in any judgment may have the same revived at any time before it is prescribed by having a citation issued according to law to the defendant, or his representative, from the court which rendered the judgment, *unless defendant or his* representatives *show good cause why the judgment should not be revived.*" The cause shown by the defendants in this case is that the judgment is absolutely null by reason of the defendants never having been cited, and because the firm of Rotchford, Brown & Co. was dissolved by the death of Johnson, one of its members, in July, 1863, sev-

·eral months before the filing of suit or rendition of judgment, which was rendered solely upon the confession of one R. A. Bourk, claiming to be the agent of the firm of Rotchford, Brown & Co.

The evidence discloses the death of Johnson at the date named in the answer; that there was no citation to the firm nor to any of the individual members; and that the judgment was based solely upon the written confession of Bourk, who claimed to act under and by virtue of a power of attorney given in 1858, by the *firm of Rotchford, Brown & Co., and not by the individual members.* The original petition did not pray for citation to a judgment against the firm, but only to and against the individual members, none of whom, as we have seen, were cited, and one of whom was at the time dead. Bourk answered for "the defendants," confessing and consenting to judgment as prayed for, which was accordingly entered *against the individual members of the firm in solido,* and not against *the firm.* The power of attorney to Bourk was from the firm *eo nomine;* was signed by but one member of the firm for it, and contained no stipulation or authorization for any purpose from the individual members of the firm to act for or represent them in any manner whatever, and no judgment was prayed for or rendered against the juridical being, the partnership, which alone he was ·ever authorized to represent for any purpose. It is therefore not necessary to inquire, under this state of facts, whether, had such judgment been rendered after the dissolution of the firm by the death of Johnson, without the knowledge of Bourk, its mandatory, it would have effect, nor whether he had, under the mandate, power to confess judgment. It may, however, not be out of place to remark that it was expressly held by this court in Brashear vs. Dwight, 2 A. 404, that the presumed continued existence of the firm for the purpose of its obligation, by reason of dealings without notice of dissolution, which can only be maintained upon the doctrine of the united agency of the partners, is very distinct from "the manner of bringing the partners of a dissolved partnership into court." In that case the plaintiff, one of the members of a commercial firm, ·enjoined the execution of a judgment against the firm, upon the ground ·that he had never been cited, and had no knowledge of the suit until the seizure of his property by the sheriff, and that the citation was served upon one of his partners after the dissolution; and the court held that he was entitled to personal citation, and that the judgment could not be executed against him. It needs no citation of authority for the proposition that a partnership is an "ideal" or juridical "being," as perfectly distinct from the individuals who compose it as one individual person is from another, as was said in Tury vs. Harris, 10 A. 625; .and that a power of attorney or mandate from the partnership gives no˙ power to represent the partners as individuals. This was expressly

ruled in regard to the same power of attorney in Johnson vs. Brown, 18 A. 337, in which case one of the present defendants was sole defendant. There was then no citation to or representation of any of the defendants in the original suit in which the judgment was rendered, the revival of which is here sought.

"Citation being the essential ground of all civil actions in ordinary proceedings, the neglect of that formality *annuls radically* all proceedings had, unless the defendant have voluntarily appeared to the suit and answered the demand." C. P. article 206. The nullity may be alleged even collaterally in any form of proceeding, by any one having the least interest to have the nullity pronounced. 1 N. S. 9; 21 A. 26; Williams vs. Clark, 11 A. 761; 24 A. 252; 8 N. S. 145; 6 L. R. 577.

In order to constitute a suit or action there must be at least two parties present or represented. C. P. article 99; 6 N. S. 517; 4 L. 158; 5 L. 424; 17 L. 479.

No valid judgment can be rendered against a party where there is no suit, nor where he has not been legally cited. 17 A. 91; 21 A. 613; same 630; Michie vs. Brown & Co. et al., 20 A. 75, a case where citation was served at the place of business of the firm after its dissolution and without notice of dissolution upon an agent of one of the partners, who was also chief clerk of the firm, and the court held that "the citation was insufficient and the judgment without effect."

It is elementary that suit can not be brought against a dead man, and our own Code of Practice points out the mode of proceeding where one dies against whom there is a cause of action. Article 120. It is, however, urged by counsel that article 2813 of the R. S. and article 3547 of the R. C. C. only fix the prescription of judgments, and the mode of arresting that prescription; and that under this proceeding to revive a judgment, it can not be annulled or pronounced null. That is very true as to all *relative nullities,* but not as to absolute nullities, such as the want of citation, without which there was and could be neither suit nor valid judgment, as we have seen. It is essential to the revival of a judgment that there should be a subsisting one. That the party seeking revival has such valid judgment is an essential allegation and fact to be proven in a proceeding to revive it; and if it be essential both to allege and prove its valid existence, that fact may be disproved by the defendant, and certainly constitutes not only "good cause" against the revival, in the language of the statute, but the best possible cause (i. e.) that what has the form of and appears to be a valid and subsisting judgment is not so either in fact or law.

It would indeed be a vain thing to vex the courts with inquiry and the defendant with citation if he were not allowed to contest the very existence of the thing sought to be revived, and equally vain would be

the revival if, in fact, the judgment had no real existence, or force in law as such. Courts of justice deal with the substance and not the shadow of causes. It can not be for a moment doubted that a party condemned without citation or hearing could sue to have that fact judicially determined, and yet more evidently that he may use the same fact as an exception to preserve his rights if sued. C. P. article 20. This he may do at any time the judgment so obtained is sought to be enforced against him, for any purpose or in any manner; and even could it be held that he must bring such suit within a fixed time, as it can not by the express terms of article 612 C. P. Nowhere and to no class of cases is more applicable the maxim: " *Quæ temporalia sunt ad agendum perpetua sunt ad excipiendum.*" We have been referred by plaintiff's counsel to the cases of Drogue and Moreau, 23 A. 173; Carondelet Canal Navigation Company vs. De St. Romes, 23 A. 437; and McStea vs. Rotchford, Brown & Co., decided by the present court, and reported in 29 A. p. 69. These are all suits to revive judgments. The first case decides nothing except that in a proceeding to revive a judgment the question whether it was rendered *upon sufficient evidence* can not be inquired into. The case was twice before our predecessors, and is first reported in 21 A. p. 639, from which it appears that it was remanded because the record did not contain satisfactory evidence of *the existence* of the judgment and of its ownership by the plaintiff, it appearing that the judgment was rendered by default and *no citation* appeared in the record as originally sent up; a fact which the court considered, as we do in the present case, essential to the *existence* of the judgment. The present court also held in a case not reported, decided at Monroe in July last, that in a proceeding to revive the evidence upon which the judgment was rendered, the basis of the claim sued on could not be inquired into. In the St. Romes case the defendant averred that she was not legally cited and had not signed nor authorized the signing of the obligation sued on. The court said: " The record shows she was legally cited," and that the other ground of defense should have been established before judgment, and was not a defense in such action. The 29th A. case of McStea vs. Rotchford, Brown & Co. is the only one which seems to support the views of the plaintiff's counsel. An evident error crept into the opinion in that case in regard to the decision in the St. Romes case, in which as we have seen the court did not, as stated in the opinion in the McStea case, " reject " the plea of want of citation, but on the contrary said that " *the record disproved the truth of the plea.*" There was at the time considerable hesitation on the part of some members of the court as to the decision itself, and it will be observed that it was said "*perhaps* a total and entire want of citation to any one might be pleaded," and the effect of the decision was carefully guarded and con-

fined to the arresting of prescription, without in any manner validating the judgment if affected with nullities. Further reflection and examination of authority in the present case leave upon our minds no room for doubt upon the subject. The want of citation in the original suit affects the judgment with such absolute nullity that it may be pleaded even in an action to revive under the statute for the arresting of prescription, and constitutes good cause why no judgment of revival should be rendered.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be and it is affirmed with costs of both courts.

---

MANNING, C. J. I adhere to the doctrine of the previous cases, and enforced with some elaboration in McStea v. Rotchford, 29 Annual, 69, and re-affirmed in Burnside v. Rotchford and Pace v. Marbury, both decided last year and unreported.

There can be but one issue in a suit to revive a judgment, and that is whether it exists—not whether it ought to exist, or ought ever to have been rendered, but simply and solely whether such a judicial act was ever done as rendering it. And this is obvious to my mind when you consider how and why a suit for revival is instituted. A suit of that kind was unknown to our law until a few years ago. The first one ever instituted was probably in 1861, and they became necessary because an Act of 1853 had taken judgments out of the category of imprescriptible things: That law made a judgment prescriptible by the lapse of ten years, and if it had stopped there, there would have been no means of averting prescription, for while the law has always declared that notes and mortgages etc shall be prescribed, it has in the same breath told you how to prevent its acquisition. Therefore because the act of 1853 made a judgment prescriptible, it had to provide the means of averting prescription, and that is all it does. That is its sole object, and its title is terse and significant—' an act relative to the prescription of judgments.' Acts 1853, 250.

When then you admit any other issue in a suit for the revival of a judgment than judgment vel non, you apply the statute to other purposes than those it was designed for. If you permit a party to plead causes of nullity you virtually construe it as an amendment to art. 556 of the Code of Practice, which has for its object the designation of the modes of annulling a judgment.

I must also maintain the correctness of the interpretation put upon the St. Romes case in the opinion read by me in McStea v. Rotchford, and I do this with great deference to the contrary views just expressed by my colleagues. The enunciation there made that "the object of this

proceeding is merely to keep in force the judgment rendered in 1859 by interrupting prescription," contains the gist of the controversy, and in my judgment is the true exposition of the law, and it has been so held in every case by this court until the present one.

If there had never been any prescription applied to judgments, there would never have been any occasion to revive them.    The suit to revive is merely the means, and the sole means, to prevent prescription, and the only inquiry in such suit is, was such judgment ever rendered? A judgment of revival does nothing more than decree that such judgment had been theretofore rendered, and does not preclude any attack upon it from any quarter for any cause save only prescription, which the statute of 1853 was specially designed to save.

## ON REHEARING.

DEBLANC, J.   In 1863, on the 7th of December, a judgment rendered two days before in favor of Conery and against the defendants, was signed by the Judge of the second district Court.

In 1873, on the 30th of January, Conery instituted an action, for the use of Charles Gallagher, to have said judgment revived.   This action is brought against the succession of Joseph H. Johnston, Philip Rotchford, an absentee, and Shepherd Brown, a resident of the City, who heretofore composed the commercial firm of Rotchford, Brown & Co.

The granting of plaintiff's application is opposed, on the grounds:

1.   That the judgment sought to be revived was rendered without citation to the interested parties, on the confession of one Bourk, then pretending to be, but who was not the agent of said firm.

2.   That—to the knowledge of Bourk, Conery and Gallagher—that judgment was rendered after the dissolution of said firm by the withdrawal of Rotchford and the death of Johnston.

The time when Rotchford withdrew from the partnership was not shown on the trial, but it was shown that Joseph H. Johnston died on the 31st of July 1863, four months and five days before the rendition of the judgment which plaintiff is attempting to revive.

On the 15th of March 1870, Charles Gallagher addressed a note to Bourk, the agent of said firm, to enquire whether he knew, when he was cited in that capacity, in December 1863, that Joseph H. Johnston was dead.   Bourk answered in writing that he did not.   The letter and the answer were introduced in evidence, without objection on defendant's part.

On the trial, plaintiff's counsel holding a document, said to Bourk, who was then on the stand as a witness: "Look at this, Mr. Bourk." The witness examined the document, did not swear that his signature was attached to it, or that he had ever seen it; and—without any fur-

ther examination tending to identify the paper which he then held, plaintiff's counsel offered it in evidence as "*written memorandum marked A.*" That memorandum is Gallagher's letter to Bourk and the latter's answer to it.

The agent's incomplete declaration on this important point leaves the impression that he knew, when he confessed the judgment, that Johnston was dead, the partnership dissolved, his mandate at an end. If so, the judgment sought to be revived has never had any legal existence: but plaintiff's and defendant's failure to either verify or contradict the contents of the memorandum now before us, compels us to remand this case.

If, by the parties' course, we were not precluded from referring to a petition copied in the transcript and which forms the very basis of Conery's judgment, we would certainly have adhered to our first decision: but our attention has been tardily called to the fact that—instead of relying, as they should have done, on the pleadings filed in Conery's suit—the parties have selected and placed before us but fractions of the same, and—in so doing—removed from the range of our consideration the petition alluded to.

We deem it proper to state that—in passing on an application to revive a judgment, the Court—unless restricted by the parties' course and by an exclusive statement of facts, has the right to and should consider—whether actually introduced or not—every pleading filed in the suit in which the judgment was obtained.

It is therefore ordered and adjudged that our former decree is set aside, the judgment appealed from avoided and reversed, and this case remanded to the lower Court to be proceeded in according to law; the costs of the appeal to be paid by plaintiff.

## On Rehearing.

Manning, C. J. I am constrained to dissent from this judgment also, because I think the plaintiff is entitled to a revival of the original judgment as prayed, and as this case overturns our jurisprudence on this question, I will once for all give the reasons for my construction of the Act of 1853.

I base my construction of it both upon reason and authority.

Upon reason, by ascertaining its true intent and meaning in that way, pointed out by the Great Commentator as one of the surest and safest means of learning it. "The most universal and effectual way of discovering the true meaning of a law, says Sir Wm. Blackstone, when the words are dubious, is by considering the reason and spirit of it, or

. the cause which moved the legislator to enact it, for when this reason ceases, the law itself ought likewise to cease with it." 1 Com. 61. And in another place he says, it is useful and often necessary, in order to arrive at the true meaning of a new law, to ascertain what was the defect in the old law that had to be remedied, and to remedy which the new law was made. And again, a non-enacting part of a law, as the pream-ble, is often called in to help the construction of an act of parliament.

How much more shall the title of a law be called in to help the con-struction of one of our statutes, when by express constitutional com-mand, every law can embrace but one object, and that object must be expressed in its title. . Const. 1852 art. 115. That was the organic law in . force when in 1853, the legislature passed 'an Act relative to the prescrip-tion of judgments.' Acts, p. 250.

The old law was, that judgments were imprescriptible, or to speak more accurately, no fixed time had been set for the prescription of a judgment *eo nomine.* The object of the new law was to fix a time—to establish with certainty a period, the lapse of which would affect judg-ments as notes, or other obligations were affected by the lapse of time—and thus to introduce a new rule or principle into our law *quoad* judg-ments. If it had then been contended, under the Act, that one might attack a judgment because of alleged nullities—that you might inquire whether the judgment ought to have been rendered—that you might shew a defective citation, or an illegal consideration for the contract which the judgment gives effect to, or that a document, such as a power of attorney, in evidence on the trial when that judgment was rendered, was void—or that any other evidence then used was inadmissible, or that all of it together was insufficient—if any attempt to annul the original judgment for any of these, or other like reasons, had been made, the answer would have been that the object of the Act is not the annul-ment of judgments—that it can not embrace more than one object, which is the prescription of judgments, and that object is expressed in its title, and I can not perceive why this objection, which would have been unanswerable then, has lost its force from the mere incorporation of this Act in the Revised Statutes without its title, as are all other statutes.

If the intent of the legislator had been to provide by this act a new mode of annulling judgments, or a new mode of revising or reversing them, its title would have been, 'an act relative to the prescription of judgments, and to the manner in which they may be annulled, and to provide a mode of reversing them otherwise than by appeal.' The Code of Practice had definitively set out the four modes by which judg-ments could be revised, set aside or reversed, viz, by a new trial, by an appeal, by an action of nullity, and by rescission. art. 556. And it had

also defined the causes for which this third mode might be employed. arts. 605—7. But by construing this act of 1853, so as to let in by way of cause shewn to a demand for revivor, the defences that either were not made, or were unsuccessfully made, to the original action, is not only to construe it as providing a new and additional mode of annulling a judgment, but also as providing and authorizing a method of reversing a judgment, which, until this case, was supposed could only be done on an appeal.

What then is the justification of this construction? My brethren rest it upon the clause—unless the defendant shew good cause why the judgment should not be revived. What is the use of enacting that a judgment may be revived unless good cause be shewn why it should not be, if in the proceeding for its revival you are not permitted to shew all good causes?

The first answer to this question, which contains as in a nutshell the whole argument for the construction of the statute now adopted, is that already mentioned, viz, that you must construe the statute by reference to the state of the law existing at, and the circumstances surrounding and attending its passage, and when these so manifestly and unerringly point to a particular and special thing as the sole object of the legislature in its enactment, you can not, consistently with the undisputed rules of construction, apply it to other objects. And the force of this consideration is redoubled, and the point or idea, or principle stands out in bolder relief when it is perceived that disregard of it revolutionizes the whole theory of legal construction, and displaces the order and regularity and gradation of judicial proceedings, for when was it ever broached before, that where a party refused to take the next step after a judgment had wrongfully condemned him, viz to appeal for its reversal, after a new trial had been denied him; and when he neglected or abandoned his remedy by an action of nullity, that he could, under cover of a statute made for another purpose, accomplish what until then could be accomplished only by an appeal or by an action of nullity.

But another answer is, that analogy and a comparison of other systems of law in the parts corresponding to this novel feature in our own, shew us what this act means.

At common law, writs of execution must be sued out within a year and a day after the judgment is entered, otherwise the court concludes *prima facie* that the judgment is satisfied and extinct. But, as provided by statute 13 Edw. 1. c. 45, a writ of *scire facias* will be granted after that time has passed, "for the defendant to shew cause why the judgment should not be revived." I have quoted the exact language of Blackstone in this last sentence, 3 Com. 421, and the reproduction of

these identical words in our statute of 1853, is not an accidental circumstance. The process mentioned in the statute equally well displays the kinship of our act. It would seem that it did not even contemplate a suit, but only a 'citation' to the party to shew cause. These indicia shew that, when the legislature had in view the application to judgments in our system of those rules, which had obtained elsewhere, and for the first time created for them a presumption of payment which until then it ignored, and was preparing a law to give effect to this presumption, that it sought guidance from the parallel provision of a system of law, in use in the adjoining and other States, and adopted the same, or a kindred, proceeding here to effect what had been long effected there, and no one will argue that because it did not call it a *scire facias*, therefore it is not substantially the same thing. The whole system of recording evidences of title to property is of American origin, and in most of the States it is called 'registering,' and the officer who performs that duty is called a 'Register,' but it would scarcely be argued that because we call him 'Recorder,' and his work 'recording,' that there is any difference in the nature of the functions.

I have said that I based my construction of this Act upon authority as well as reason.

1863 is the first and earliest date when any judgment could be prescribed in this State, and the first suits for revival were therefore commenced a year or two before, and hence we find no decisions in this State upon the statute we are considering, until the resumption of this court's business after the close of the war. In all of the decisions, without exception, until the present case, the doctrine has been held and maintained that the sole object of the statute of 1853 was to apply prescription to judgments, and to specify and formulate the manner of averting it. We held in an unreported case at Monroe last summer, where the defendant attempted to shew for cause why a judgment should not be revived, that the consideration of the note for which it was rendered was illegal, that he could not be permitted to go into that defence, and this was in harmony with McStea v. Rotchford, 29 Annual, 69. which was itself but a reiteration of the principle previously adjudicated, but perhaps not till then so sharply defined. Since the opinion in this case was read on the first hearing, another case presented the question of revival of a judgment which had been rendered against one defendant upon a citation addressed to, and served upon another defendant, and the majority of the court held this want of citation could be inquired into in the suit for revival. These two cases are the only departure from the rule established by all the previous decisions.

I think the solitary question that a court can consider in an action of revivor under this statute, is—was the judgment rendered, the revival

of which is sought; and where the original plaintiff brings the action for revival, the only evidence necessary to entitle him to a judgment is a certified copy of the original judgment rendered in his favor.

If that judgment ought never to have been rendered,—if it contains extrinsic or intrinsic vices which destroy its legal existence—the party, against whom it is rendered, may have it reversed on appeal, or may annul it by an action, and to these methods alone he is remitted for relief. He can not avail himself of this peculiar proceeding, provided by a special statute for a special purpose, to accomplish what other and general laws have afforded him ample means and opportunity to do.